Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

FILED
CHARLOTTE, NC

APR 23 2025

US DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT

for the Western

District Of North Carolina

Charlotte Division

Case No. 3:25-CV-275-MOC

SHIRLEY R. WRIGHT )
*Plaintiff* )
)
) Jury Trial: X Yes    No
-v- )
)
WELLS FARGO BANK, National )
Association (N.A.) )
*Defendant* )
)
)

**COMPLAINT FOR EMPLOYMENT DISCRIMINATION**

I. **The Parties to the Complaint**

   A. **The Plaintiff**
   Name: Shirley Wright
   Address: 4220 Colony Plaza Drive
        Apt. 263
   City and County: Charlotte, Mecklenburg County
   State and Zip Code: North Carolina, 28211
   Telephone Number: 704-905-8992
   Email Address: Shirley.R.Wright1@gmail.com

B. **The Defendant**
   Name: Wells Fargo Bank, National Association (N.A.)
   Job or Title: A national banking association
   Address: 420 Montgomery Street
   City and County: San Franciso, San Francisco County
   State and Zip Code: California, 94104
   Telephone Number: 800-869-3557

C. **Place of Employment**
   The address at which I sought employment of was employed was by the defendant is
   Name: Two Wells Fargo Center & Three Wells Fargo Center
   Street Address: 301 South Tryon Street & 401 South Tryon Street
   City and County: Charlotte, Mecklenburg County
   State and Zip Code: North Carolina, 28202

## II. Basis for Jurisdiction

This action is brought for racial discrimination, retaliation, harassment, failure to promote, demotion, and creation of a hostile work environment in employment, pursuant to Title VII of the Civil Rights Act of 1964, as codified at 42 U.S.C. §§ 2000e to 2000e-17. Jurisdiction is specifically conferred on this Court by 42 U.S.C. § 2000e(5). Additional Jurisdiction is based on 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 1981 et seq.

## III. Statement of Claim

A. The discriminatory conduct of which I complain in this action includes:

   X   Termination of Employment

   X   Failure to promote me

   X   Retaliation

   X   Other: Harassment, Hostile work environment, and Demotion.

B. It is my best recollection that the alleged discriminatory acts occurred began in or around Early 2020 and were ongoing and continuous until April of 2024. Exact dates can be confirmed in the discovery phase.

C. I believe the defendant is still committing these acts against me because I continue to suffer lost income.

D. The defendant discriminated against me based on my race.

E. The facts of my case are as follows:

Count 1: In or around March of 2020, I reported my manager Natasa Tran, for making racially biased comments about our department's new Indian Director, a Black male co-worker, and myself.

Supporting Facts: Natasa Tran, a white woman, was my manager in 2020. In that year Ram Nadu, and Indian man was appointed our director. After his appointment, Natasa began to make race-based complaints to me about him on work related calls. 1. After our team was required to take an online training about Indian culture, Natasa verbally protested that it was ridiculous and commented that Ram was getting divorced because "his culture does not respect women." 2. Shortly after that, and prior to ending a work-related call, Natasa warned me to "watch the news and to not get stuck alone in an elevator with him." When I asked her what she had heard about him, she stated that "men of his culture cannot control themselves around women." 3. During the same time, Natasa expressed anger at the promotion of a black male co-worker on our team. Natasa stated that he was "only promoted because he was black," and referring to him as "lazy Aubrey" when he was recognized for his contributions. 4. Natasa accused the black male co-worker of being "too lazy to come to work" when his father died. Around this time, Natasa also began to make stereotypically prejudiced remarks about me. 5. During work calls, Natasa would taunt me to not "go all angry black woman on her" before assigning me tasks or asking me to additional work. This would occur despite our positive working relationship, with no prior conflict. 6. Natasa would randomly refer to me as an "angry

black woman" in jovial, and ordinary daily work conversations, laughing afterward. When her to stop using these stereotypical and prejudice perspectives, she stated that "once a co-worker asked her if she liked vodka because she's Russian, and she didn't go home and cry about it." I reported Natasa's behavior to human resources in or around March of 2020. 7. After several months of investigation, the investigator stated that Natasa's comments were merely "insensitive" and closed my case as "unsubstantiated". I escalated the matter within Human Resources/Enterprise Investigations and requested a new review. 8. The new investigator stated that Natasa's comments did not violate Title VII, but she would no longer be a manager because she was sharing too much information with me as her subordinate. These investigations took months to complete.

Count 2: Korey Pearson blamed me for Natasa Tran leaving our group, retaliating against and harassing me, by publishing false allegations that I "unprofessionally communicated" by calling a colleague from another department a "liar." Korey's actions severely damaged my professional reputation within Wells Fargo for my remainder of my employment, prevented me from being promoted, deprived me of bonus money, and created a hostile work environment.

Supporting Facts: Prior to becoming my manager, both Natasa and I reported to Korey Pearson. Korey promoted Natasa to manager. After reporting the facts of Count 1 to Human Resouces/Enterprise Investigations, Natasa Tran transferred out of my department and became a Business Controls Officer in area. Korey Pearson sorrowfully announced her departure in an impromptu team. 1. The day after his announcement, he scheduled an abrupt and impromptu meeting where he suddenly accused me of "unprofessionally communicating" by using the word "liar." Korey alleged that I had called a colleague from the business I audited a "liar" during a meeting discussing

regulatory engagement findings thirty plus days prior. I informed him that this accusation was false, reminding him that we had previously discussed this meeting, and he made no such accusation. I questioned his timing, which seemed retaliatory in light of the discontent and despair he expressed regarding Natasa Tran leaving our group. Korey stated that "just as it was my decision to report Natasa, this was his decision, and it was final." He then published his write up containing the false allegation in the company's system or record. 2. I reported this continued retaliation to Human Resources/Enterprise Investigations, which again found the claim unsubstantiated, even after confirming that that false allegation used as the basis had been invalidated through investigation. The investigator further informed me that he could not make Korey rescind his write up based on invalidated allegation. 3. Korey Pearson then used the write up containing the invalidated false allegation as his basis to issue me a negative performance evaluation rating. 4. The negative rating cost me thousands of dollars in bonus pay because it made me ineligible for a bonus of up to 25% of my salary, which I had received the year prior in the amount of approximately $11,000.00. The write up also made me ineligible for promotion and would go on to be used against me in the future to harm my professional reputation, my earning potential, and cause me mental anguish, stress, and embarrassment.

Count 3: Cathy Cave-Sitzman used her sixteen-year, self-proclaimed personal & professional relationship with Korey Pearson to continue retaliating against me, harassing me, damaging my professional reputation, and diminishing my earning potential after I fell under her leadership. Cathy enlisted the assistance of my new manager, Daniel Sweeney, her direct report.

Supporting Facts: In or around early 2021, I was removed from Korey Pearson's team and was placed on Daniel Sweeney's team, where Cathy Cave-Sitzman became Director. 1. After joining Daniel's team, he immediately issued me a negative performance rating, stating that corporate policy dictated he must rate me based on Korey Pearson's prior performance review. I explained the circumstances to Daniel, but he stated that there was "nothing he could do." Cathy scheduled an introductory call with me in or around mid 2021. During this call, Cathy voluntarily informed me of her close personal and professional relationship with Korey Pearson that spanned over sixteen years and that they often spoke on the telephone. Shortly after Cathy became director and made the disclosure, my professional relationship with Daniel Sweeney deteriorated. 2. Daniel continued to cite the language from Korey's prior write up and tying his evaluations back to Korey Pearson's comments. When questioned, he stated that although he had only known me to communicate and behave professionally, he had to include Korey's prior false allegations from my prior year's performance evaluation. Daniel told me not to worry about the words used within the evaluation. In or around August of 2021, after speaking with Daniel about the language he used in my performance evaluation, I met with Cathy Cave-Sitzman to discuss it and how it was unfairly harming me professionally. After speaking, Cathy stated that she would have Daniel Sweeney change the language he used or include an amendment to my evaluation clarifying that I was not unprofessional and why the language was included. 3. While Daniel initially agreed to change the language, he ultimately refused to formally publish the changes. I made Cathy aware of his refusal to do so. 4. Cathy and Daniel then scheduled a meeting with me where only Cathy spoke, stating that I was being written up. I reported the retaliation to Human Resources. The language Daniel refused to change was then used as the basis to

issue me an adverse "inconsistently meets" rating within my end of year performance evaluation. The rating cost me thousands of dollars in bonus pay because it made me ineligible for a bonus of up to 25% of my salary which I had not received since prior to reporting Natasa Tran. The write up also made me ineligible for promotion. 4. I filed a complaint with Human Resources/Enterprise Investigations and provided them evidence of Daniel's initial agreement to change the language as well as his later refusal. Human Resources deemed my claim unsubstantiated. 5. Cathy then began to write me up using false allegations, continuing into 2022. When I provided her documentation from emails and instant messages that evidenced the falsity of her allegations, she then wrote me up again for being "unreceptive to feedback." 6. She and Daniel stated that I was not allowed to provide evidence to refute allegations made by management. 7. I reported the retaliation to Human Resources, and they again found the claims unsubstantiated.

Count 4: Christy Gray discriminated against me by directing stereotypically racist language at me. Christy racially harassed me and retaliated against me by writing me up, issuing me a negative performance evaluation, writing me up, and wrongfully terminating my employment after I reported her.

Supporting Facts: In late January of 2023, I accepted a new position in Regulatory Relations reporting to Director Christy Gray. During our first scheduled one-on-one meeting, Christy informed me that she had spoken to my prior managers, reviewed all my human resource records, and read all my prior workpapers. Christy then asked me if I had seen the movie *Point of No Return*. After acknowledging that I was familiar with the movie, she stated that she was "the cleaner" and, like him, she was the person tapped to get rid of people. She further stated that since she joined Wells Fargo, she had gotten rid of two problematic employees, one Asian and one Muslim, who were making complaints

to Human Resources about her. After inquiring as to why she was informing me of this, she stated that it was "important that I remember that." 1. During my first week in the new department Christy stood in front of my coworkers and demanded that I stand up and rap, I declined. Christy peppered me with questions about rappers' lifestyles and made fun of the gold necklace I wore declaring I was "from the hood." 2. About a month or so later, a co-worker was injured, Christy solicited me and another co-worker to select a flower arrangement to send her. After we selected the arrangement together, Christy called me over to her desk and showed me a picture of a stuffed monkey. pointing at me and then the monkey repeatedly, while laughing hysterically. I asked her why she was only showing me the monkey and pointing at me and laughing while doing so, but she would not speak. I walked away and returned to my desk. 3. For the rest of the week, Christy would make monkey noises when walking by and entering my cube. On Friday of that week, during a team phone call, after telling everyone to have a good weekend Christy stated, "Shirley the monkey, Shirley the monkey", while laughing before ending the call without saying anything else. Christy then began accusing me of joining the group with the intention of taking her job. She stated that the way I dressed relayed that I wanted her job. I asked Christy to cease her behavior and informed her that it was offensive and prejudiced, which visibly upset her but led to no behavioral changes. 4) Christy then began to openly complain about a black female employee referring to her as an "angry black woman" but when I inquired as to what she had done to her she stated that she just didn't like her. Christy's assistant Victoria Borkey agreed with Christy's assessment of the co-worker and could not explain their dislike of her. Christy's assistant Victoria would later ask me if watermelon was my favorite flavor. 5) When a black male employee joined our regulatory relations group Christy and Joseph Kannon began

referring to him as "homeboy". I pulled them both aside and requested they stop doing so. Joseph Kannon stated that he was on the autism spectrum and often said offensive things due to his condition, Christy did not explain or acknowledge my request. 6. In or around April of 2023 I had a meeting with Christy in a conference room about her behavior. During that meeting I asked Christy if she was familiar with Title VII prohibitions to which she stated she was not. I explained what it was, what it prohibited and that we were all required to take anti-discrimination training as Wells Fargo employees. Christy still stated she was not familiar with either. She then inexplicably asked me if I would I "go all angry black woman if she got her hair braided?". After months of enduring this behavior, I attended a department wide town hall meeting where a co-worker asked the Diversity, Equity, and Inclusion executive, Kristy Fercho, if she had the results from the company project to "identify the root cause of Wells Fargo's difficulty retaining black, female talent". The executive responded that they determined it was their "onboarding experience." This resonated with me. I requested a meeting with Christy's manager, Megan Grad-McNamee, to report her behavior and request she intervene. 7. After reporting her behavior Christy and her manager wrote me up and became hostile. Christy continued to make monkey noises when walking by my cube. 8. Additionally, on one occasion Christy came into my cube and violently shook me in my chair from behind, causing me to hit my knee on the underside of my desk. She then turned my chair 180 degrees to face her. When I was turned around, she was stone faced but then began laughing hysterically. She was holding her phone in her outstretched hand so close to my face that it almost hit me in my face. On her phone was a picture of a tween girl in a purple dress who Christy stated was "so hot she needed a rape whistle". I would not agree. Christy then stated this girl was her niece, offered me a gummy (she'd

previously described as an "upper") from a Ziplock bag and walked out of my cube. I reported these instances to Human Resources and shortly thereafter Christy and all of my other team members, except the black male co-worker she and Jospeh called "homeboy", moved their desks to the other side of the building. 8) In or around June or July of 2023, I filed a complaint in person with the EEOC. On the day that the EEOC sent notice to Wells Fargo of the charge Christy scheduled an impromptu meeting where I was notified that I was being demoted to a Business Execution Consultant. This was a demotion because the qualifications for this role required less experience and the max salary for this position was $25,000.00 lower. 9. In the mornings when I went to the vending machine in the breakroom on the other side of the building, when Christy was present heating her breakfast, she would follow me out and walk closely on my heels making monkey sounds. 10. Christy then began tripling my workload in comparison to other team members and making false allegations about me not completing work I had documented proof was in fact completed. 11. Christy and Megan used these false allegations and the retaliatory write up issued by her and Megan as the basis to issue me an "inconsistently meets" performance rating in 2024 costing me thousands of dollars in bonus money. I was eligible for a bonus of up to 25% of my income which could have exceeded $25,000.00. The rating made me ineligible for promotion and ineligible to participate in a mentorship program I was invited to join, headed by Executive and Operating Committee member Kristy Fercho. I had shared the invitation to join with Christy prior to my performance evaluation because I needed her consent to take part in it. Instead, I received a bonus of approximately $3,000.00. After presenting evidence of my work to Christy and Megan that disputed their allegations Megan verbally stated that the true cause of my rating was due to my work being "less important" than that of my

team members. However, the verbal root cause was not documented in the language of the performance evaluation. The write up only included false, defamatory allegations about conduct and work not performed. 12. Christy then terminated my employment on April 24, 2024, refusing to give a specific verbal or written explanation for having done so.

Count 5: Megan Grad-McNamee was/is Christy Gray's manager and an Executive in Regulatory Relations. 1. In early May of 2023, I spoke with Megan via video conference about Christy's conduct. I recited the specific examples listed in count 4 above. Initially, Megan acknowledged the seriousness of the allegations and stated that she would consult and involve her senior human resources professional who would contact me. I was never contacted by anyone in human resources in relation to that conversation. Two weeks after my conversation with Megan she scheduled a follow up call. During this meeting Megan never mentioned Christy's behavior and attempted to talk to me about inconsequential life events like we were old friends. I asked Megan about next steps and or outcomes related our previous conversation about Christy's conduct. Megan stated that she "wasn't sure" what was going on with that and that she would get back to me. 2) Shortly thereafter, on a Saturday, I received an evite for a meeting from Christy Gray. During that meeting Megan was present and was the only speaker. Megan stated that she and Christy had decided to write me up based on information I had reported to Christy in or around March or April of 2023 about commentary and an email sent by a person from another department. Megan and Christy refused to explain how a situation that I reported and was substantiated by a Regulatory Relations Principal, Joseph Kannon, was being used to warrant a Formal Warning against me. Megan stated this warning would operate as a Final Written Warning and that if Christy identified any more problematic behavior I

would be terminated. 3) I contacted Human Resources to report the retaliatory write up and to report Christy's behavior that was previously reported to Megan. Human Resources informed me that Megan had not opened a case back in May as she stated she would. 4) After making the complaint with Human Resources, Megan became hostile towards me and used our scheduled one on one time to berate me and act as an attorney for Christy. Megan angrily questioned why I told Human Resources that she had not opened a case on my behalf. I told her it was Human Resources that informed me. Megan angrily stated that she gets yelled at by her bosses and doesn't complain, equating that to being racially harassed. Due to the one on one's being optional and being repurposed to harass me and cause me additional mental anguish, I began to opt out of participating to avoid Megan's hostility. 5) After doing so Megan would not communicate with me at all and when visiting the Charlotte office would not speak to me. 6) Megan included my choice to opt out of these optional meetings within my performance evaluation and used it as a basis to support the negative rating assigned. Megan and Christy also stated within my performance evaluation that I would not speak to my co-workers even though they all moved away from me and stopped talking to me. This was also used as a basis to support my negative rating. 7) I reported the retaliation to Human resources who found my claim unsubstantiated, despite Megan's conduct. 8) I was terminated abruptly on April 24, 2024, without a verbal or written explanation as to grounds.

## IV. Exhaustion of Federal Administrative Remedies

A. It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on April 30, 2021; June 07, 2023, and February 20, 2024.

B. The Equal Employment Opportunity Commission issued a Notice of Right to Sue letter, which I received on January 23, 2025.

## V. Relief

I respectfully request the Court order Wells Fargo Bank, N.A. pay compensatory damages in the amount of $1,000,000.00 for lost income, lost benefits, lost bonus income, lost income from promotion, mental anguish, stress, medical expenses, litigation costs to be incurred, diminished credit rating due to late and or defaulted payments, and loss of retirement savings. I also respectfully request the court impose punitive and or exemplary damages in an amount no less than $1,000,000.00 to deter Wells Fargo Bank, N.A. from continuing to promote and condone a corporate culture that is willfully and or intentionally blind to malicious discrimination, retaliation, and oppression. Finally, I respectfully request, the Court order Wells Fargo Bank, N.A. to provide favorable future employment verification and destroy the disciplinary records associated with my employment due to their malicious, false, and defamatory nature.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

A. **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of Signing: 04/23/2025

Signature of Plaintiff *Shirley R. Wright*

Printed Name of Plaintiff  Shirley R. Wright